# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **TACTICAL STOP-LOSS LLC, TSL HOLDINGS, INC. and AMERICAN TRUST ADMINISTRATORS, INC.,** | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **Case No. 4-08-cv-00962-FJG** |
| **TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA,** | ) ) ) | |
| **Defendant.** | ) ) | |

## TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S
## REPLY SUGGESTIONS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Defendant Travelers Casualty and Surety Company of America ("Travelers") moved for summary judgment on plaintiffs' Complaint on two grounds (aside from the claim for vexatious refusal to pay). First, Travelers based its Motion for Summary Judgment on the Crime Policy's "Officer-Shareholder" exclusion of coverage for

> loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by . . . any LLC Member or Officer-Shareholder, whether acting alone or in collusion with others.

Travelers also moved for summary judgment on the second category of loss claimed by plaintiffs, transfers from the trust accounts into the operating account, because those transfers do not constitute a loss under the Crime Policy.

On the first ground, the Officer-Shareholder exclusion, Plaintiffs' Suggestions in Opposition (Doc. No. 87) argue that Travelers is not entitled to summary judgment even though

plaintiffs acknowledge that Griffith "actively participated in an embezzlement conspiracy with then-President James E. Fox." (**Doc. No. 87, p. 1**). Plaintiffs argue that (a) the Officer-Shareholder exclusion does not mean what it says; (b) if the Officer-Shareholder exclusion does mean what it says, it is ambiguous; and (c) if the Officer-Shareholder exclusion does mean what it says and is not ambiguous, it does not apply because Griffith's active participation in the embezzlement conspiracy with Fox somehow involved "independent" acts. In making these arguments, plaintiffs find ambiguity where none exists, misconstrue the purpose of the exclusion, and attempt to cast sole blame for the claimed loss on a subordinate who played a subordinate role in the scheme. This Court should apply the exclusion as written and reject plaintiffs' tortuous attempt to evade facts which inevitably bring that exclusion into play.

As to the second ground, the lack of any compensable loss for transfers from the trust accounts into the operating account, plaintiffs argue (1) they were forced to enter into repayment agreements to avoid litigation with their carriers, (2) Westrope and Timmons contributed a considerable amount of their personal funds, and (3) their loss created a new liability rather than merely shifting a liability. Careful examination of plaintiffs' claims in this regard, however, reveals that these arguments do not establish that plaintiffs actually suffered a loss.

## TABLE OF CONTENTS

Table of Authorities…………………………………………………………………………………3

Plaintiffs' Response to Travelers' Statement
 of Uncontroverted Material Facts……………………………………..……………………5

Travelers' Response to Plaintiffs' Additional
Statement of Facts…………………………………………...…………………………....9

Legal Argument…………………………………………………………………………………19

Conclusion……………………………………………………..………………...33

List of Additional Exhibits to Reply Suggestions in Support
of Motion for Summary Judgment……………………………………………...35

**TABLE OF AUTHORITIES**

LEGAL ARGUMENT………………………………………………………..19

**I. PLAINTIFFS MAY NOT CONTRADICT THE DEPOSITION
TESTIMONY OF THEIR 30(B)(6) REPRESENTATIVE**……………………………19

*Rainey v. American Forest and Paper Ass'n, Inc.*, 26 F.Supp.2d 82, 95
(D.D.C. 1998)……………………………………………………………………19

**II. PLAINTIFFS FAIL TO GIVE EFFECT
TO THE OFFICER-SHAREHOLDER EXCLUSION**…………………………...20

**A. CONSTRUCTION OF THE OFFICER-SHAREHOLDER
EXCLUSION**………………………………………………………………….20

*Todd v. Missouri United School Ins. Council*, 223 S.W.3d 156, 163 (Mo. 2007)……………20

*Empire Bank v. Fidelity & Deposit Co. of Maryland*, 27 F.3d 333, 336
(8th Cir. 1994)…………………………………………………………………...21

*Maryland Cas. Co. v. Clements,* 15 Ariz.App. 216, 224, 487 P.2d 437, 445
(Ariz.Ct.App. 1971)…………………………………………………………...22

*In re Payroll Exp. Corp.,* 216 B.R. 344 (S.D.N.Y. 1997),
*aff'd*, 186 F.3d 196 (2d Cir. 1999)……………………………………………..22

**B. THE *HALL* CASE CITED BY PLAINTIFFS IS NOT IN POINT**……………………22

*Hall v. Aetna Casualty & Surety Co*., 89 F.2d 885, 888 (2d Cir. 1937)………………………...23

**C. THE USE OF THE PHRASE "OTHER PERSONS" IN
THE DEFINITION OF "SINGLE LOSS" DOES NOT SUG-
GEST THAT THE WORD "OTHERS" USED IN THE OF-
FICER-SHAREHOLDER EXCLUSION DOES NOT IN-
CLUDE EMPLOYEES**……………………………………………………...24

**D. THE PURPOSE OF THE OFFICER-SHAREHOLDER
EXCLUSION IS TO PRECLUDE COVERAGE FOR ACTS**

**OF OWNERS, NOT TO AGGREGATE THE ACTS OF
SEVERAL CONSPIRATORS INTO ONE LOSS**……………………………………....24

S. Arena, D. Burkholder & E. Hurwitz, *Exclusions Other Than
Inventory Loss*, in Annotated Commercial Policy 285 (2d ed. 2006)………………………...24

*Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886)………………………………..24

S. Cozon and R. Bennett, *Fortuity: The Unmamed Exclusion*,
20 Forum 222 (1985)………………………………………………………………………25

*East Attucks Community Housing, Inc. v. Old Republic
Sur. Co*., 114 S.W.3d 311, 319, 320 (Mo.Ct.App. 2003)……………………………………..25

*Purdy Co. of Illinois v. Transportation Ins. Co*., 209 Ill.App.3d 519,
568 N.E.2d 318 (Ill.Ct.App. 1991)..…………………………………………...…………...…25

**E. THE OFFICER-SHAREHOLDER EXCLUSION IS NOT
AMBIGUOUS**……………………………………………………………………………..25

*East Attucks Community Housing, Inc. v. Old Republic
Sur. Co*., 114 S.W.3d 311, 320 (Mo.Ct.App. 2003)……………………………………………..26

*Lincoln County Ambulance v. Pac. Employers Ins.*, 15 S.W.3d 739,
43 (Mo.Ct.App. 1998)………………………………………………………………………...26

**III. THE ACTS COMMITTED BY GRIFFITH WERE NOT
INDEPENDENT OF THE "EMBEZZLEMENT CONSPIRACY"
IN WHICH, BY PLAINTIFFS' OWN ADMISSION,
GRIFFITH "ACTIVELY PARTICIPATED"**……………………………...……………….….27

*Seifner v. Weller*, 171 S.W.2d 617, 623 (Mo. 1943)……………………………...……….....28

*Porter v. Erickson Transport Corp*., 851 S.W.2d 725, 736
(Mo.App. 1993)…………………………………………………………………...………....28

*Dickson v. Microsoft Corp*., 309 F.3d 193, 205 (4th Cir. 2002)………………………………31

*Purdy Co. of Illinois v. Transportation Ins. Co*., 209 Ill.App.3d 519, 526
568 N.E.2d 318, 322 (Ill.Ct.App. 1991)………..………………………...……………….32

**IV. THE TRANSFERS FROM THE TRUST ACCOUNTS
INTO THE OPERATING ACCOUNT DID NOT RESULT
IN A LOSS TO PLAINTIFFS**………………………………………………………………32

*Ronnau v. Caravan International Corp.*, 205 Kan. 154, 159, 160
468 P.2d 118, 122 (Kan. 1970)……………………………………………………………32

**V. TRAVELERS IS NOT LIABLE FOR VEXATIOUS RE-
FUSAL TO PAY**…………………………………………………………………..……32

*Internat'l Minerals and Min. Corp. v. Citicorp North America,
Inc.*, 736 F.Supp. 587, 596, n. 8 (D.N.J. 1990)……………………………………………33

*United States v. United States Currency*, No. 06-0862-CV-W-FJG,
2008 WL 4816984 (W.D.Mo. Oct. 31, 2008)………………………………………………...33

*Columbian Nat'l Life Ins. Co. v. Keyes*, 138 F.2d 382 (8th Cir. 1943)………………………33

**CONCLUSION**………………………………………………………………………………33

**PLAINTIFFS' RESPONSE TO
TRAVELERS' STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

Plaintiffs explicitly agree that they do not controvert most of Travelers' Statement of Uncontroverted Material Facts. As to those portions of Travelers' Statement of Uncontroverted Material Facts that plaintiffs purport to controvert, when one examines the portions of the record upon which plaintiffs rely, it is apparent that plaintiffs have generally not complied with Rule 56.1 of the Local Rules, which requires that Suggestions in Opposition to a Motion for Summary Judgment "refer specifically to those portions of the record upon which the opposing party relies [then all] facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party." In accordance with Fed.R.Civ.P. 56(d)(1), those facts that are not explicitly controverted, as well as those facts that are not controverted in accordance with the Local Rules, should be taken as established in the action.

Travelers will note here only those responses that require further comment:

24. Plaintiffs claim that paragraph 24 of Travelers' Statement of Uncontroverted Material Facts is incomplete and cite another portion of the Proof of Loss, but do not provide the complete statement, which reads as follows:

> Griffith acting alone of in collusion with Fox to misappropriate company funds and funds belonging to the Company's clients; *Fox taking and misappropriating company funds and funds belong to clients.* [emphasis added]

**Doc. 81-2, p. 1**.

26. Plaintiffs are correct that the letter dated March 27, 2008, was not attached to the Proof of Loss, but merely referenced in it.

35. Plaintiffs controvert the testimony of Joseph D. Timmons, their own representative designated under Fed.R.Civ.P. 30(b)(6), who answered "yes" when asked a question worded essentially the same as paragraph 35 of Travelers' Statement of Uncontroverted Material Facts. **Doc. 81-1, p. 22, line 14-p. 23, line 16; p. 74, line 9-p. 75, line 2**.

47, 48, 49, 51, 52, 53, 54, 55, 56, 57, 58, and 59. Plaintiffs complain that these paragraphs of Travelers' Statement of Uncontroverted Material Facts are incomplete, which is true, but they did not purport to be complete. Plaintiffs also contend that "Griffith herself committed several independent acts that caused Plaintiffs' loss and which resulted in benefits to her." However, as discussed at section III of the Legal Argument section of these Reply Suggestions, the allegedly independent acts of Griffith are all actually acts committed as part of her active participation "in an embezzlement conspiracy with then-President James E. Fox," as plaintiffs phrased it in the Introduction to their Suggestions in Opposition.

61. Plaintiffs contradict the testimony of Joseph D. Timmons, their own representative designated under Fed.R.Civ.P. 30(b)(6), who when asked which transfers Ms. Griffith did on her own answered "I don't know specifically." **Doc. No. 81-1, p. 97, line 8-p. 98, line 13**.

62. Plaintiffs contradict the testimony of Joseph D. Timmons, their own representative designated under Fed.R.Civ.P. 30(b)(6), who admitted all the improper benefits Griffith allegedly received are included in the second category of loss on p. 2 of the Proof of Loss. **Doc. No. 81-1, p. 119, line 21-p. 120, line 8**.

63. Plaintiffs contend that paragraph 63 is a legal conclusion and is not proper in a statement of facts, but do not controvert the statement of fact itself. Plaintiffs' own representative designated under Fed.R.Civ.P. 30(b)(6), Joseph D. Timmons, acknowledged that the transfer of funds from the trust accounts into the operating account would not have caused a loss if they had been immediately transferred back into the trust accounts so long as plaintiffs kept the funds that were supposed to be on hand. **Doc. No. 81-1, p. 57, line 18-p. 58, line 4**.

65. Plaintiffs complain that this paragraph of Travelers' Statement of Uncontroverted Material Facts is incomplete, citing in addition the deposition testimony of Joseph D. Timmons, their 30(b)(60 representative, from p; 87, line 15 to p. 90, line 8. However, the additional testimony actually does not concern additional specific acts of theft Griffith allegedly committed but instead the purpose of her acts (**Doc. No. 81-1, p. 87, lines 15-p. 88, 12**); and whether the payments Ms. Griffith made to herself were part of the unauthorized transfers from the trust accounts to the operating account (**Doc. No. 81-1, p. 88, line 13-p. 90, line 8**).

66. Plaintiffs complain that this paragraph of Travelers' Statement of Uncontroverted Material Facts is incomplete, which is true, but it did not purport to be complete. Therefore, plaintiffs have not controverted paragraph 66 of Travelers' Statement of Uncontroverted Material Facts.

74. Only by a highly selective (and incomplete) reading of Griffiths' Sworn Statement, can plaintiffs controvert this Fact. In Ms. Griffith's Sworn Statement (**Ex. S**), she testified that

she did not have authority to move money between trust accounts and that Fox would tell Griffith when he moved money from trust accounts through online banking. **Ex. S, p. 10, lines 7-17; p. 16, line 2-p. 17, line 4; p. 18, lines 7-24; p. 19, lines 5-23; p. 20, line 9-p. 22, line 23; p. 23, line 3-p. 24, line 22; p. 32, line 15-p. 34, line 4; p. 39, line 7-p. 45, line 18; p. 47, line 10-p. 49, line 2; p. 50, line 5-p. 51, line 4.** In the above cited portions of her Sworn Statement, she did, however, testify that while she doesn't recall having done so, it is possible that she may have moved money from one carrier's account to another once or twice. However, in view of plaintiff's admission that Griffith "actively participated in an embezzlement conspiracy with then-President James E. Fox," the possibility that Ms. Griffith may herself have moved funds hardly matters because plaintiffs' admission establishes that she acted in collusion with Fox, thus triggering the Officer-Shareholder exclusion.

75. Ms. Griffith testified that she may have moved money from one carrier account to another once or twice. She did not, however, testify that she made transfers from trust accounts into the TSL operating account. See portions of Griffith's Sworn Statement cited in paragraph 74, above. (**Ex. S**).

76. Ms. Griffith testified that she had to rely on Fox telling her when he moved money to post it. See portions of Griffith's Sworn Statement cited in paragraph 74, above. (**Ex. S**).

77. Ms. Griffith was never asked in her Sworn Statement whether Fox ever asked her to make any internet transfers from a TSL account into Fox's personal bank account or whether she ever did so nor whether Fox ever instructed her to make any transfers from the trust accounts into the TSL operating account. However, in her Deposition (**Doc. 81-16**), she did testify as indicated. Consequently, the Sworn Statement does not controvert this Fact.

82. The source documentation was not the spreadsheets, which are summaries, but instead the direct deposit or electronic funds transfer documentation, which was not provided. **Doc. No. 55, p. 10; Doc. No. 81-17, p. 45, line 19-p. 46, line 23**.

83, 84, 85, 86, 87, 88. Plaintiffs claim that these facts invade the province of the jury, but, confusingly, that they are "*legal conclusion[s]* to be decided by the *trier of the fact*." Plaintiffs also claim, without citing any parts of the record on which they rely, as required Rule 56.1 of the Local Rules, that these facts are controverted. Plaintiffs' claim is not a proper response to facts contained in a statement of uncontroverted material facts and these facts should, therefore, be deemed admitted.

## TRAVELERS' RESPONSE TO
## PLAINTIFFS' ADDITIONAL STATEMENT OF FACTS

1. Uncontroverted.

2. Controverted. The cited page of the Complaint does not state the premium paid for the Crime Policy coverage. The copy of the Crime Policy attached to the Complaint states that the premium for the Wrap+ Policy, which includes many coverages besides the Crime Policy. was $47,600 for the entire Policy. **Doc. No. 1-1, 6th page**. Furthermore, Travelers objects to this Statement of Fact because the amount of premium paid by plaintiffs for the Wrap+ Policy or any component of it neither adds nor detracts from the coverage provided and is, therefore, irrelevant.

2. Uncontroverted.

3. Uncontroverted.

4. Uncontroverted.

5. Uncontroverted.

6. Uncontroverted.

7. Uncontroverted.

8. Uncontroverted.

9. Uncontroverted.

10. Uncontroverted.

11.     Controverted. Griffith testified that Fox would tell Griffith when he moved money from trust accounts through online banking and Griffith never had occasion to move money between trust accounts because she wasn't authorized to do so (**Doc. No. 81-16, p. 90, line 19-p. 94, line 11);** Griffith would tell Fox when an account was short and Fox would then make transfers from trust accounts into the TSL operating account; (**Doc. No. 81-16, p. 94, line 12-p. 95, line 14; p. 96, line 19-p. 97, line 7);** Griffith had to rely on Fox telling her when he moved money to post it; (**Doc. No. 81-16, p. 94, lines 4-7**); Fox never asked Griffith to make any internet transfers from a TSL account into Fox's personal bank account nor did she ever do so; (**Doc. No. 81-16, p. 104, lines 8-13**); and Fox never instructed Griffith to make any transfers from the trust accounts into the TSL operating account nor was she authorized to do so until Fox was removed; **Doc. No. 81-16**, **p. 94, lines 8-14; p. 104, lines 14-23.**

12.     Controverted. Griffith testified that she did not learn about the transfers into Fox's account no. 9509 until she became aware of it after review of a bank statement one month and went and asked Fox if they had set up a new account. Fox informed her that it was his personal account, so she asked him how to record it and he told her to record it as his personal account. **Doc. No. 81-16, p. 78, lines 10-23.**

13. Uncontroverted.

14. Uncontroverted.

15. Uncontroverted.

16. Controverted. Ms. Griffith testified that she may have moved money from one carrier account to another once or twice. She did not, however, testify that she made transfers from trust accounts into the TSL operating account. Griffith's Sworn Statement. **Ex. S, p. 44, line 11-p. 45, line 18**.

17. Uncontroverted.

18. Controverted. In the portions of Griffith's Deposition cited by plaintiffs in support of this paragraph, Griffith testified that she created P & Ls and balance sheets that identified the transfer to account no. 9509, which was Fox's personal bank account, as a "Misc. loan," but that she does not now know whether Westrope or Timmons received copies of the balance sheets she prepared. Controverted that she did not want anyone else in the company to know about the transfers because Griffith testified that she felt the loans should have been very apparent to astute businessmen since they weren't the ones taking out the loans and that was her way of making everyone aware that this money was being used by a member. **Ex. T, Griffith Deposition, p. 112, lines 4-17**.

19. Controverted. Griffith testified that after Fox's termination, Joseph D. Timmons told her to do the very same thing Fox had done, which was to find money somewhere, take it from there and pay the bordereau and Mr. Timmons didn't let the carriers know that anything was amiss until January 2008, three months after Fox's termination. **Griffith's Sworn Statement (Ex. S), p. 18, line 7-p. 20, line 8.** Consequently, one cannot assume that Timmons would have stopped the unauthorized transfers had Griffith told him about them or when he would have stopped them.

20. Controverted. Griffith testified that when it came time to close the Treaty with Presidential Life, she asked Fox what he wanted her to do and he told her to make Ex. 1, a Statement with the Union Bank header that Griffith inserted. Griffith's Sworn Statement. **Ex. S, p. 30, line 18-p. 31, line 14.** It did not purport to be a bank statement and Presidential Life never believed it was a bank statement because it did not have a beginning or ending balance. **Ex. U, Deposition of T. Munderville, p. 22, line 4; p. 29, lines 7-15**.

21. Uncontroverted, but incomplete. The testimony of Ms. Munderville completely belies the notion that Griffith was engaged in an independent course of conduct to deceive Presidential Life. For one thing, Ms. Munderville testified that she spoke with Fox himself about her difficulties in getting bank statements and he told her he was working on it with the bank, but she never did get bank statements. **Ex. U, Deposition of T. Munderville, p. 63, lines 11-23**. He also told her he was going to try to get Presidential Life on the account at Union Bank that held funds belonging to Presidential Life, but that never happened, either. **Ex. U, Deposition of T. Munderville, p. 62, line 14-p. 63, line 10**. In fact, after Ms. Munderville contacted the bank herself to ask about bank statements, Fox called her and he was extremely agitated because she was calling the bank, "poking around where she shouldn't be" and he responded that she "better get out of his business . . . or else." She testified that she "felt threatened." **Ex. U, Deposition of T. Munderville, p. 31, line 17-p. 32, line 12; p. 35, line 16-25; p. 37, line 6-p. 38, line 18**.

22. Controverted. In the portion of Ms. Munderville's Deposition cited by plaintiffs, she testified that she was very suspicious right from the beginning, but she did not testify that Griffith lied.

23. Uncontroverted that Griffith testified that she created P & Ls and balance sheets that identified the transfer to account no. 9509, which was Fox's personal bank account, as a "Misc. loan," but that she does not now know whether Westrope or Timmons received copies of the balance sheets as she prepared them. Controverted that the balance sheets concealed the loans because Griffith testified that she felt the loans should have been very apparent to astute businessmen since they weren't the ones taking out the loans and that was her way of making everyone aware that this money was being used by a member. **Ex. T, Griffith Deposition, p. 112, lines 4-17**.

24. Controverted. In the portion of Griffith's Sworn Statement cited by plaintiffs in support of this Additional Fact, Griffith testified that she didn't think Fox could have prepared the monthly bordereau, although he had access to the information. She did not testify that the unauthorized transfers could not have been accomplished without her assistance and it could only be matter of speculation whether if Griffith hadn't assisted Fox, he would not have found someone else to do his bidding.

25. Uncontroverted.

26. Uncontroverted.

27. Uncontroverted.

28. Uncontroverted.

29. Uncontroverted.

30. Uncontroverted, but incomplete. Griffith also testified that she negotiated her compensation package of base pay plus bonus with Fox and that she had discussed and agreed to it with Fox; she was to be paid a bonus of $300 for every sold case where Tactical Stop-Loss would begin administering a new client's insurance coverage; Fox dictated and decided

when and how much to pay Griffith in bonuses; and Fox would ask Griffith what her balance was every month and he would say, "Well, I can only give you three [sold cases] this month. Is that okay? Fine." **Ex. T, p. 26, line 12-p. 28, line 17; p. 30, line 24-p. 31, line 19; p. 51, line 3-p. 52, line 10; p. 55, line 14-p. 56, line 13**. Thus, the claim that the payment of bonuses to Griffith represents an independent act of theft is not supported by the evidence. Moreover, the loss claimed on the Proof Loss is the transfers to Fox's personal accounts and the transfers into the Tactical Stop-Loss operating account, not payments of bonuses to Griffith. **Doc. No. 81-2, p. 2**.

31. Uncontroverted. However, Griffith testified that while her son worked for Tactical Stop-Loss, and her opinion was gathered as to his employment, Fox made the final decision to hire him, just as he did with all employees. **Ex. T, p. 33, lines 16-18; p. 35, line 5-p. 37, line 6**. . Moreover, the loss claimed on the Proof Loss is the transfers to Fox's personal accounts and the transfers into the Tactical Stop-Loss operating account, not payments of compensation to Griffiths' relatives.

32. Uncontroverted.

33. Uncontroverted.

34. Uncontroverted.

35. Uncontroverted.

36. Uncontroverted.

37. Neither the cited paragraph of the Affidavit of Joseph D. Timmons, nor any other supports this paragraph of plaintiffs' Statement of Additional Facts. Furthermore, the existence of a fiduciary duty is a legal conclusion.

38. Objection. This statement is irrelevant to any issue between the parties in this case.

39. Objection. Plaintiffs cite paragraphs 11-12 of the Affidavit of Joseph D. Timmons (Ex. 1 to the Suggestions in Opposition), but it appears that they actually mean to refer to paragraph 13. However, the liability of plaintiffs to third parties is not within the indemnity obligations of Travelers to plaintiffs. Furthermore, the statement is incorrect as a matter of law because any transfers made by plaintiffs neither increased nor decreased plaintiffs' liability to third parties. Their liability remained the same, although the funds with which to satisfy the liability may no longer have been available.

40. Controverted. Plaintiffs have agreed that paragraph 46 of Travelers' Statement of Uncontroverted Material Facts is uncontroverted. That paragraph reads:

> Fox's employment was terminated on November 30, 2007, because plaintiffs had enough information at that point in time to substantiate the facts that he was stealing money personally and utilizing it for his own personal benefit.

Plaintiffs further admit that they first provided Travelers with Notice of the Claim on March 27, 2008. **Plaintiffs' Additional Statement of Facts, para. 41**. Thus, by their own admission, plaintiffs waited almost four months in providing notice of claim. Travelers believes that such a delay hardly constitutes "prompt" notice of a claim. Further, Travelers objects to plaintiffs' characterization of Griffith's conduct as independent, because the evidence amply demonstrates that her conduct was not independent. Rather, as plaintiffs admit in the Introduction to their Suggestions in Opposition, Griffith "actively participated in an embezzlement conspiracy with then-President James E. Fox."

41. Uncontroverted.

42. Uncontroverted.

43. Uncontroverted that on April 23, 2008, plaintiffs provided a sworn Proof of Loss. Controverted that plaintiffs provided evidence of unlawful transfers out of trust accounts or a

full, detailed forensic accounting supporting the loss amount. Rather, what plaintiffs provided was a summary of unauthorized transfers from the operating account into Fox's personal account and a claim that there were unlawful transfers out of trust accounts without supplying any evidence. The Proof of Loss did not contain any summary whatsoever of the transfers from the trust accounts into the operating account, which comprises approximately two-thirds of the claimed loss. **Doc. No. 81-2.**

44. Uncontroverted that Travelers repeatedly asked for information. Controverted that plaintiffs complied with each request. Studler, Doyle & Company requested the source documentation for the transfers by a September 9, 2008, letter to counsel for plaintiffs, but Tactical Stop Loss failed to provide any direct deposit or electronic funds transfer documentation. **Doc. No. 55, p. 10; Doc. No. 81-17, p. 45, line 19-p. 46, line 23**. Travelers objects to the statement that plaintiffs anxiously awaited a coverage opinion as being irrelevant to any issue in this case.

45. Uncontroverted that Travelers retained the firm of Studler Doyle & Co. to assist in its investigation. Controverted that it was purportedly to assist in determination of coverage. The deposition of D.M. Studler, including the portion cited by plaintiffs, does not support the controverted statement. The letter about which Ms. Studler testified states that her firm had preliminarily analyzed books and records to assist Travelers in ascertaining pertinent facts surrounding the claimed loss, detailing and verifying the documentation and information provided by the various parties and determining whether there was a covered loss addressed by the policy.

46. Uncontroverted.

47. Uncontroverted.

48. Uncontroverted.

49. Uncontroverted that D.M. Studler testified in her deposition that she talked with Terry Griffith. Controverted that Amy White, Traveler's 30(b)(6) representative, testified in her deposition that Ms. Studler did not talk with Terry Griffith. Rather, Ms. White testified in her deposition that she did not read Ms. Studler's interview of Terry Griffith. The evidence cited by plaintiffs does not support the claim that Ms. Studler did not talk with Terry Griffith.

50. Uncontroverted that Travelers itself did not talk with Terry Griffith. Controverted that Travelers did not try to talk with Terry Griffith. The evidence cited by plaintiffs does not support the claim that Travelers did not try to talk with Terry Griffith and Ms. Studler, who investigated the claim on behalf of Travelers, testified that she did. **Doc. No. 81-17, p. 39, lines 18-25**.

51. Uncontroverted that on or about June 4, 2008, Ms. Studler contacted Plaintiffs' forensic accountants, Meara, Welch, Browne, P.C. ("Meara") with inquiries about the materials used to support Plaintiffs' claims. Controverted that Ms. Studler requested, and received, various information regarding "key man" life insurance policies to cover Fox, Griffith's personnel file, Fox's personal accounts, and Missouri Insurance Commission contact information. The evidence cited by plaintiffs does not support the controverted statement.

52. Uncontroverted.

53. Controverted that plaintiffs ever supplied Ms. Studler with source documentation for the transfers. **Doc. No. 55, p. 10; Doc. No. 81-17, p. 45, line 19-p. 46, line 23**.

54. Uncontroverted.

55. Uncontroverted.

56. Uncontroverted.

57. Uncontroverted. However, the complete response was: "In response to your inquiry concerning a status, please note that Studler, Doyle & Company recently received outstanding documentation and information that had been previously requested. The submitted documents and information are presently being reviewed and a response will be provided upon completion of that review and analysis. If you have any questions, please feel free to contact us." **Doc. 87-1, p. 27 of 49 (Ex. E)**.

58. Uncontroverted.

59. Uncontroverted that on September 2, 2008, and September 9, 2008, Ms. Studler requested various information. Uncontroverted that plaintiffs' counsel responded on October 1, 2008, that "we note that most of the documents you requested you have had for several months now." Travelers controverts the assertion of plaintiffs' counsel that Ms. Studler had had most of the documents she requested for several months as unsupported by the evidence cited by plaintiffs. Uncontroverted that plaintiffs answered the questions and provided some additional requested information.

60. Uncontroverted that Ms. Studler submitted her report to Travelers on September 11, 2008, and that Ms. Studler, prior to the onset of litigation, never supplemented this report or issued a second report. Controverted that Studler Doyle & Co. noted that it could not dispute Plaintiffs' claimed damages. Among other things, Studler, Doyle & Company found the monies transferred from the trust and escrow accounts to Tactical Stop Loss's operating account did not deplete or reduce Tactical Stop Loss's assets. **Doc. No. 55, p. 19**.

61. Uncontroverted that on October 6, 2008, Ms. Studler acknowledged receipt of previously requested information and requested more and that Plaintiffs sent more information on October 9, 2008, and claimed "We believe we have fully cooperated and fully responded

to your requests for information and documents . . . . please let me know when we can expect to hear Travelers' position on coverage with respect to this matter." Controverted that plaintiffs ever supplied Ms. Studler with source documentation for the transfers. **Doc. No. 55, p. 10; Doc. 81-17, p. 45, line 19-p. 46, line 23**.

      62. Uncontroverted.

      63. Uncontroverted.

      64. Uncontroverted.

      65. Controverted. Ms. White, Travelers 30(b)(6) representative, did not testify that Travelers made the decision to deny the claim at that point. Rather, she testified that Travelers likes to make sure that it gathers all its information and does a thorough investigation and does the best it can to determine whether it can find coverage and that is what it was trying to do in this case.**Doc. 87-8, Plaintiffs' Suggestions in Opposition, Ex. 8. p. 63, lines 15-23**.

**LEGAL ARGUMENT**

**I. PLAINTIFFS MAY NOT CONTRADICT THE DEPOSITION TESTIMONY OF THEIR 30(B)(6) REPRESENTATIVE**

      In several instances, as noted in the section of these Reply Suggestions headed Plaintiffs' Response to Travelers' Statement of Uncontroverted Material Facts, plaintiffs purport to contradict the testimony of their duly designated Fed.R.Civ.P. 30(b)(6) representative. Plaintiffs should not be permitted to do so. As the Court held in *Rainey v. American Forest and Paper Ass'n, Inc.*, 26 F.Supp.2d 82 (D.D.C. 1998), by commissioning a designee as the voice of a party, that Rule obligates a party "to prepare its designee to be able to give binding answers" in its behalf. It is, therefore, required by that Rule that consideration of legal and fac-

tual positions that vary materially from those taken by the party's representatives is precluded at the summary judgment stage. *Id.* at 95.

## II. PLAINTIFFS FAIL TO GIVE EFFECT TO THE OFFICER-SHAREHOLDER EXCLUSION

### A. CONSTRUCTION OF THE OFFICER-SHAREHOLDER EXCLUSION

Plaintiffs first argue that the intent of the Crime Policy is to provide coverage for an employee's *acts* and the Officer-Shareholder exclusion cannot be read to exclude coverage for an employee's acts. In the first place, that is not what the Crime Policy says. Rather, it provides coverage for certain kinds of *loss*. As applicable to the facts of this claim, the coverage would be for "direct loss of . . . Money directly caused by Theft . . . committed by an Employee, whether identified or not, acting alone or in collusion with other persons." Plaintiffs then suggest, without any support, that when the Officer-Shareholder exclusion excludes coverage for "loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by . . . any LLC Member or Officer-Shareholder, *whether acting alone or in collusion with others*," that the word "others" must not include employees because only employees are covered under the policy. But plaintiffs' argument has it exactly backwards: since only loss caused by employees is covered under the Employee Theft provision of the policy, there would be no need to exclude coverage for loss caused by acts of non-employees because loss caused by non-employees is not covered to begin with.

Not surprisingly, Plaintiffs cite no authority for their strained interpretation of the Officer-Shareholder exclusion. Indeed, the Missouri Supreme Court recently rejected a similar argument in *Todd v. Missouri United School Ins. Council*, 223 S.W.3d 156 (Mo. 2007). In *Todd*, an elementary school student brought suit against the school district's liability insurer

seeking payment for a judgment against a substitute teacher who assaulted the student on school grounds. The liability insurance policy provided coverage for personal injury as a result of an occurrence and damages as a result of a wrongful act, but it also contained an exclusion for liability for intentional acts. The plaintiff argued that when "a contract promises something at one point and takes it away at another there is an ambiguity." *Id.* at 162. But the Court disagreed, noting that insurance policies frequently include exclusions that "limit risks that otherwise might have been covered." *Id.* at 160.

> Definitions, exclusions, conditions and endorsements are necessary provisions in insurance policies. If they are clear and unambiguous within the context of the policy as a whole, they are enforceable. . . . Insurance policies are read as a whole, and the risk insured against is made up of both the general insuring agreement as well as the exclusions and definitions.

*Id.* at 163.

*Empire Bank v. Fidelity & Deposit Co. of Maryland*, 27 F.3d 333 (8th Cir. 1994), provides further support for Travelers' argument. In that case, the bankruptcy trustee of a defunct corporation sued a bank for allowing checks to be cashed without proper endorsements and without corporate resolutions on file authorizing such transactions. The bank settled the claim and then brought suit on a Financial Institution Bond under the forgery and "On Premises" coverages. Those coverages were subject to an exclusion for "loss caused by an Employee." The District Court found that an employee of the bank who allowed the checks to be cashed despite bank procedures prohibiting such practices, was the cause of the loss. The bank also argued that the exclusion could apply only to losses caused solely by a bank employee or of which a bank employee was the proximate cause. The Court of Appeals rejected that argument:

There is no support in the bond language for the theory that the bank's act must be the only cause of the loss. As for proximate cause, the district court in effect found that acts of [the employee] were the proximate cause of the loss. We need not attempt to discern the specific legal theory motivating Empire to settle Campbell's lawsuit. Although many alternative claims were pleaded, the settlement documents do not identify the basis for the settlement, consistent with most such documents. Suffice it to say that the conduct of the bank officer causing the exclusion to apply would be relevant to all pleaded theories.

*Id.* at 336.

Plaintiffs attempt to claim ambiguity in this case in the language of the Officer-Shareholder exclusion should, similarly, be rejected. This is particularly so here, where the Officer-Shareholder exclusion applies to "loss resulting *directly or indirectly* from any fraudulent, dishonest or criminal act committed by . . . any LLC Member or Officer-Shareholder [emphasis added]. To accept the argument that whenever a contract promises something at one point and takes it away at another there is an ambiguity would render every exclusion ambiguous. That clearly is not the case and Plaintiffs' argument must be rejected.

Furthermore, the cases cited by Travelers in its Suggestions in Support that involved exclusions similar to the Officer-Shareholder exclusion both concerned "others" who were fellow employees. In *Maryland Cas. Co. v. Clements,* 15 Ariz.App. 216, 487 P.2d 437 (Ariz.Ct.App. 1971), the "other" in question was the bookkeeper for the insured. *Id.* at 224, 487 P.2d at 445. In *In re Payroll Exp. Corp.,* 216 B.R. 344 (S.D.N.Y. 1997), *aff'd*, 186 F.3d 196 (2d Cir. 1999), the "others" were six other named employees. If plaintiffs' argument in this case were correct, then in both of those cases there would have been coverage. Yet in both cases, the Courts held that if the other employees did not independently cause loss by their own acts, there was no coverage because of the exclusion.

## B. THE *HALL* CASE CITED BY PLAINTIFFS IS NOT IN POINT

Plaintiffs cite *Hall v. Aetna Casualty & Surety Co.*, 89 F.2d 885 (2d Cir. 1937), as substantially similar to our case. It is difficult to understand how plaintiffs could find the two cases similar, however. In *Hall*, Aetna issued a bond to indemnify a bank against losses incurred through "any dishonest act wherever committed, of any of the Employees . . . whether acting alone or in collusion with others. . . ." The bond excluded loss resulting directly or indirectly from any act of a director. DeWitt, a director who was also county treasurer, deposited in his personal account at the bank checks drawn on his account as county treasurer and then used the proceeds for his own benefit. The Court of Appeals held that the cashier of the bank had committed dishonest acts by allowing DeWitt's misappropriations to occur and Aetna was therefore liable. Aetna contended that the loss resulted directly or indirectly from the acts of DeWitt, who, as a director was excepted from coverage by the bond. The Court of Appeals affirmed the District Court's holding that the acts of DuBois in honoring DeWitt's checks caused the losses, that DeWitt *acted as a depositor, not as a director*, when he diverted the funds, and that his acts would not have resulted in any loss if DuBois had not participated in the wrong by allowing the checks to be paid. *Id*. at. 888.

If *Hall* had involved an exclusion from coverage for loss resulting directly or indirectly from any act committed by a director, "whether acting alone or in collusion with others" and had discussed whether the word "others" included employees, then plaintiffs' argument might have some force. But *Hall* did not discuss whether the word "others" did not include other employees, which is plaintiffs' argument here, because the bond in that case did not include such an exclusion. In addition, in *Hall* the Court concluded that the exclusion for loss resulting from acts of a director did not apply because DeWitt's actions were not committed in his capacity as a director, a distinction that does not apply in this case. Thus, because

Hall doesn't involve the exclusion applicable here nor discuss plaintiffs' argument that "others" doesn't include employees, to call *Hall* substantially similar is a stretch, to say the least, and it provides no support for plaintiffs' argument that the Officer-Shareholder exclusion does not apply.

### C. THE USE OF THE PHRASE "OTHER PERSONS" IN THE DEFINITION OF "SINGLE LOSS" DOES NOT SUGGEST THAT THE WORD "OTHERS" USED IN THE OFFICER-SHAREHOLDER EXCLUSION DOES NOT IN-CLUDE EMPLOYEES

Plaintiffs argue that the definition of "Single Loss" somehow suggests that the word "others" used in the Officer-Shareholder exclusion does not include employees. While it is true that the definition of "Single Loss" uses the phrase "other persons," that term is not the same as the word "others" used in the Officer-Shareholder exclusion. Furthermore, it is also significant that the Single Loss definition uses the phrase "committed by an Employee or *committed by more than one Employee* acting alone or in collusion with other persons [emphasis added]." In the context of the Single Loss definition, it would be reasonable to assume that the other persons are non-employees because of the phrase "committed by more than one Employee." On the other hand, because the Officer-Shareholder exclusion does not use the phrase "committed by more than one Employee," there is no reason to assume that "others" means non-employees.

### D. THE PURPOSE OF THE OFFICER-SHAREHOLDER EXCLUSION IS TO PRECLUDE COVERAGE FOR ACTS OF OWNERS, NOT TO AGGREGATE THE ACTS OF SEVERAL CONSPIRATORS INTO ONE LOSS

Plaintiffs argue that the purpose of the Officer-Shareholder exclusion is to aggregate the acts of several conspirators into one loss. Plaintiffs are mistaken. The purpose of the Officer-Shareholder exclusion is to preclude coverage for loss resulting from acts of the insured

or one of the owners of the insured, because acts committed by such individuals (in this case, one of its members and owners) should not be considered to be acts of an employee. **Ex. V. S. Arena, D. Burkholder & E. Hurwitz,** *Exclusions Other Than Inventory Loss***, in Annotated Commercial Crime Policy 285 (2d ed. 2006)**. Other rationales for such an exclusion include preventing a wrongdoer from profiting from his own wrongdoing; *Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886), and the fact that insurance does not cover loss from non-fortuitous acts and intentional acts committed by the insured or one of its owners are non-fortuitous. **S. Cozon and R. Bennett,** *Fortuity: The Unmamed Exclusion***, 20 Forum 222 (1985).** As the Missouri Court of Appeals noted in *East Attucks Community Housing, Inc. v. Old Republic Sur. Co.*, 114 S.W.3d 311 (Mo.Ct.App. 2003), it is against public policy to allow one to insure against one's own thefts, dishonest acts, or intentionally inflicted damage. *Id.* at 319. Plaintiffs' construction of the Officer-Shareholder exclusion would lead to the absurd result that where an insured suffered a loss through the dishonest acts of its 100% owner who acted in collusion with an employee, it could nevertheless recover under a fidelity policy for that loss because the exclusion would not apply to acts of the colluding employee.

While fidelity insurers generally do consider that loss resulting from the acts of several co-conspirators constitutes only one loss, the question of what constitutes a Single Loss has to do not with the threshold issue of whether there is coverage, the issue implicated by the Officer-Shareholder exclusion, but with the amount of coverage if coverage exists.[1]

## E. THE OFFICER-SHAREHOLDER EXCLUSION IS NOT AMBIGUOUS

---

[1] Plaintiffs cite *Purdy Co. of Illinois v. Transportation Ins. Co.*, 209 Ill.App.3d 519, 568 N.E.2d 318 (Ill.Ct.App. 1991), and similar cases for the proposition that the purpose of the phrase "in collusion with others" is to require that the acts of conspirators be aggregated so as to constitute a single loss. Travelers does not quarrel with that statement when the phrase is used in the context of the single loss limit. But that does not mean that the purpose of the phrase is the same when it is used in the Officer-Shareholder exclusion, because that exclusion deals with a different issue than the amount of loss for which an insurer could be liable.

Plaintiffs argue that the Officer-Shareholder exclusion is ambiguous. Of course, the mere fact that the parties disagree over the interpretation of the terms of a contract does not create an ambiguity. *East Attucks Community Housing, Inc. supra*, at 320. If by giving the language used its plain and ordinary meaning the intent of the parties is clear and unambiguous, a Court will not resort to rules of construction to interpret the contract. *Id*. The language used will be viewed in the meaning that would ordinarily be understood by a layperson. *Lincoln County Ambulance v. Pac. Employers Ins.*, 15 S.W.3d 739, 743 (Mo.Ct.App. 1998).

Travelers believes that a layperson who looked at the Crime Policy would see that while the Crime Policy provides coverage for "direct loss of . . . Money directly caused by Theft . . . committed by an Employee, whether identified or not, acting alone or in collusion with other persons," that coverage is subject to a number of exclusions which limit risks that otherwise might have been covered, including the Officer-Shareholder exclusion. A layperson reading the Officer-Shareholder exclusion would see that it excludes coverage for "loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by . . . any LLC Member or Officer-Shareholder." A layperson would further see that the Crime Policy excludes coverage for "loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by . . . any LLC Member or Officer-Shareholder" even if an LLC Member or Officer-Shareholder acted in collusion with others. If a layperson were aware that an LLC Member and Officer-Shareholder had committed fraudulent, dishonest or criminal acts that directly or indirectly resulted in a loss and that a subordinate of the LLC Member and Officer-Shareholder had acted in collusion with the LLC Member and Officer-

Shareholder, Travelers believes that the layperson would have no difficulty in concluding that the Officer-Shareholder applied and that there was no coverage for the loss.

## III. THE ACTS COMMITTED BY GRIFFITH WERE NOT INDEPENDENT OF THE "EMBEZZLEMENT CONSPIRACY" IN WHICH, BY PLAINTIFFS' OWN ADMISSION, GRIFFITH "ACTIVELY PARTICIPATED"

Plaintiffs contend in their Suggestions in Opposition, alternatively, that "Griffith herself committed several independent acts that caused Plaintiffs' loss and which resulted in benefits to her." In doing so, plaintiffs are strangely reluctant to talk about the acts of Fox and to use the word "collusion" (now that they apparently recognize the significance of the term as it relates to coverage)  although plaintiffs have not always been so loath to do so.

Specifically, plaintiffs have stated: (1) "Griffith has been acting in collusion with Fox to illegally divert TSL's and ATA's funds" and "Griffith . . . aided and abetted Fox in stealing from TSL and ATA"*; Doc. No. 81-1, p. 21, line 15-p. 23, line 8 and Doc. No. 81-3, p. 2* [emphasis added]; (2) in their Petition against Fox in the Circuit Court of Jackson County, Missouri that Fox himself transferred funds (note that the allegations appear to describe exactly the same conduct as that mentioned in the Proof of Loss), **Doc. No. 81-9, para. 20, 22, and 23**; (3) their very similar statements in their Claims in the Estate of James E. Fox, Deceased, in the Probate Division of the Circuit Court of Jackson, **Doc. Nos. 81-10 and 81-11**; (4) in response to Travelers' First Interrogatory No. 14 that "Griffith . . . knowingly misrepresented . . . facts in an effort to aid Mr. Fox;" **Doc. No. 81-12** ; (5) in their Petition, First Amended Petition and Second Amended Petition against Griffith in the Circuit Court of Jackson County, Missouri that "Griffith was acting in collusion with Fox and otherwise aided and abetted in misappropriating funds from TSL and ATA," "she fostered the continued unlawful transfers" and "she knew of and was a part of" material misrepresentations to conceal the unlawful

transfers Ex M, N & O; and (6) in the Complaint in this case that Fox diverted "over $900,000 into his personal bank account; and . . . over $1.5 million from the various separate dedicated accounts into Tactical Stop-Loss's Operating Account to fund operations;" that "Griffith was acting in collusion with Fox to illegally divert Tactical's and ATA's funds", "she "knew about Fox's unauthorized transfers" and she "misled the auditors" "in order to aid and abet Fox and to make herself valuable to him." **Complaint (Doc. No. 1) para. 11-13**).

The doctrine of *quasi estoppel* prevents a party from taking a position directly contrary to or inconsistent with another position previously taken. *See, e.g., Seifner v. Weller*, 171 S.W.2d 617, 623 (Mo. 1943); *Porter v. Erickson Transport Corp.*, 851 S.W.2d 725 (Mo.App. 1993). The *Porter* case is particularly instructive. There, the driver of a tractor pulling a tank trailer sued the lessor of the tractor for injuries he sustained when a pump hose on the tank trailer exploded in his face causing permanent impairment of his vision. The lessor (Erickson) claimed that it was the employer of the driver and, therefore, was immune from suit under the workers compensation statutes. The trial court granted summary judgment against the lessor on that defense and the Court of Appeals affirmed. It noted that drivers of vehicles leased to Erickson were not covered by its workers compensation insurance. That resulted in lower workers compensation premiums for Erickson. In fact, there was a written agreement that specifically stated that drivers were not employees of Erickson. The Court of Appeals stated:

> Now, contrary to the solemn recitals of the agreement (and wholly inconsistent with the conduct of the parties prior to the accident), Erickson unabashedly asserts Plaintiff was its employee for workers' compensation purposes, thereby insulating Erickson from common law negligence liability. . . .
>
> Generally, a party will not be permitted to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by

him. Because of the painstaking effort Erickson made to insulate itself from workers' compensation liability to Nikki's driver, we are unpersuaded . . . [that we must] allow Erickson to now escape liability to Plaintiff by proclaiming he was its employee for workers' compensation purposes.

*Id.* at 736.

Because of plaintiffs' repeated assertions of Fox's involvement in the unauthorized transfers and Griffith's collusion with Fox, they should not be allowed to deny what they have said so many times before.

Furthermore, when one examines the allegedly independent acts of Griffith, it is apparent that they are all actually acts committed as part of her active participation "in an embezzlement conspiracy with then-President James E. Fox," as plaintiffs phrased it in the Introduction to their Suggestions in Opposition. Plaintiffs argue that Griffith's actions were the "but for" cause of plaintiffs' losses. The test under the Officer-Shareholder exclusion is not whether Griffith's actions were the "but for" cause of plaintiffs' losses, but instead whether "the loss resulted[ed] *directly or indirectly* from any fraudulent, dishonest or criminal act committed by [Fox], whether acting alone or in collusion with others [emphasis added]." In light of Fox's unquestioned involvement in the unauthorized transfers, that test is clearly met. Joseph Timmons, plaintiffs' 30(b)(6) representative, admitted that Fox was personally involved in every one of the transfers of funds that went into his personal bank account. **Doc. No. 81-1, p. 99, line 25-p. 100, line 5**. He testified that he did not know which transfers Griffith made. **Doc. No. 81-1, p. 97, line 8-p. 98, line 13.** Griffith testified in her Sworn Statement (**Ex. S**), that with the possible exception of one or two transfers between carrier trust accounts, she did not have authority to move money between trust accounts and that Fox would tell Griffith when he moved money from trust accounts through online banking. **Ex. S, p. 10, lines 7-17;**

**p. 16, line 2-p. 17, line 4; p. 18, lines 7-24; p. 19, lines 5-23; p. 20, line 9-p. 22, line 23; p. 23, line 3-p. 24, line 22; p. 32, line 15-p. 34, line 4; p. 39, line 7-p. 45, line 18; p. 47, line 10-p. 49, line 2; p. 50, line 5-p. 51, line 4.** Her testimony in her Sworn Statement is essentially consistent with her testimony in her Deposition, that Griffith would tell Fox when an account was short and Fox would then make transfers from trust accounts into the TSL operating account: **Doc. No. 81-16, p. 94, line 12-p. 95, line 14; p. 96, line 19-p. 97, line 7;** that Griffith had to rely on Fox telling her when he moved money to post it: **Doc. No. 81-16, p. 94, lines 4-7;** that Fox never asked Griffith to make any internet transfers from a TSL account into Fox's personal bank account nor did she ever do so: **Doc. No. 81-16, p. 104, lines 8-13;** and that Fox never instructed Griffith to make any transfers from the trust accounts into the TSL operating account and she wasn't authorized to do so until Fox was removed. **Doc. No. 81-16, p. 94, lines 8-14; p. 104, lines 14-23.** In other words, the evidence establishes that Fox made virtually all of the transfers.

Plaintiffs, nevertheless, point to the following as allegedly independent acts: (1) there is no evidence that Fox asked Griffith to conceal the theft from Westrope and Timmons; (2) Griffith admitted that she never intended to tell Westrope or Timmons about the embezzlement scheme; (3) Griffith acted independently of Fox to fund her illegitimate "bonuses" and her family's salaries; and (4) Griffith received benefits by having her son, daughter-in-law, and husband employed by Tactical. **Suggestions in Opposition at pp. 37 and 38 of 43.**

As to (1) and (2), which can fairly be characterized as concealment, it is obvious that if Griffith concealed the unauthorized transfers, this would have concealed Fox's dishonest acts ( and would have been conduct indirectly related to a criminal act of Fox) and plaintiffs' 30(b)(6) representative, Joseph Timmons, admitted as much. **Doc. No. 81-1, p. 98, line 14-p. 99, line 5;**

see also **Doc. No. 81-13, para. 21,.** As to (3) and (4), the evidence does not establish that these were independent acts. **Ex. T, p. 26, line 12-p. 28, line 17; p. 30, line 24-p. 31, line 19; p. 33, lines 16-18; p. 35, line 5-p. 37, line 6; p. 51, line 3-p. 52, line 10; p. 55, line 14-p. 56, line 13**. Merely asserting that they are independent is wholly insufficient, Furthermore, as to the employment of Griffith's relatives, plaintiffs have pointed to no evidence that they were paid more than what they should have been or that they should not have been hired. Consequently, there is no reason to believe that their employment, even if it had been at the behest of Griffith was dishonest or in any way improper, much less that it amounted to Employee Theft, so as to be covered under the Crime Policy.

Plaintiffs appear to assume that if Griffith had different motives from Fox, then her acts must have been independent. But, it is well-settled that the fact that co-conspirators need not share the same motive or goal; rather, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002). In short, despite plaintiffs' attempt to characterize Griffith's actions as independent, they have not identified any actions that were not part of the "embezzlement conspiracy with then-President James E. Fox," in which she "actively participated."[2]

---

[2] *Purdy Co. of Illinois v. Transportation Ins. Co.* , 209 Ill.App.3d 519, 526, 568 N.E.2d 318, 322 (Ill.Ct.App. 1991), cited by plaintiffs as noted above on another issue, supports Travelers' position in this regard. It holds:

> A finding of collusion between [the dishonest employees] does not require that they jointly initiated a common scheme in concert to defraud their employer. Therefore, even if each man began stealing independently, they became sufficiently implicated and concerned in each other's fraud and may be deemed to have acted in collusion with the other when they discovered or became aware of each other's scheme, and overtly assisted, not merely in each other's cover-up, but also in each other's perpetration of the on-going fraud.

Travelers notes that in this case, unlike *Purdy*, the evidence appears to show that there was only one scheme.

## IV. THE TRANSFERS FROM THE TRUST ACCOUNTS INTO THE OPERATING ACCOUNT DID NOT RESULT IN A LOSS TO PLAINTIFFS

Plaintiffs claim that they suffered a loss because (1) they were forced to enter into repayment agreements to avoid litigation with their carriers, (2) Westrope and Timmons contributed a considerable amount of their personal funds, and (3) their loss created a new liability rather than shifting a liability. If the repayment agreements and contributions were a loss, one would expect plaintiffs to list some evidence of them on their exhibit list, not to mention referring to them in their Proof of Loss and discovery responses, but plaintiffs have not done so (**Doc. Nos. 81-2, 81-4, the answer to interrogatory no. 3 in Doc. Nos. 81-7, 81-8 and 81-8, and Doc. No. 84**). Indeed, their claimed loss has never been anything but the transfers listed in their Proof of Loss, which makes no mention of repayment agreements or amounts contributed. **Doc. No. 81-1, p. 19, line 19-p. 20, line 8.** Furthermore, Westrope and Timmons are not insureds under the Crime Policy and any contributions they may have made to their business are irrelevant to any loss. Finally, plaintiffs' liability to third parties is not a new liability, for they were liable to the third parties when they received premiums and, were still liable to those third parties in the same amount after the unauthorized transfers. In any case, plaintiffs' liability to third parties is not covered under the Crime Policy. Moreover, the Crime Policy is not a liability policy and provides no coverage for plaintiffs' liability to others. An insurer under a fidelity bond is liable only in event of loss sustained by the insured. *Ronnau v. Caravan International Corp.*, 205 Kan. 154, 159, 468 P.2d 118, 122 (Kan. 1970). Therefore, the obligation of the insurer runs to the insured to respond to loss it sustains, not the loss of third persons. *Ronnau, supra*, 205 Kan. at 160, 468 P.2d at 122.

## V. TRAVELERS IS NOT LIABLE FOR VEXATIOUS REFUSAL TO PAY

Plaintiffs have not disputed Travelers' argument that if it is not liable under the Crime Policy, there can be no award of damages for vexatious refusal. Furthermore, their assertion, without any support in the record, that there are disputed issues of material fact on the issue of vexatious refusal, should be rejected for failing to comply with the Local Rules. Since plaintiffs did not, as required Rule 56.1 of the Local Rules, "refer specifically to those portions of the record upon which the opposing party relies [then all] facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party," they have failed to establish that there is a genuine issue of material fact. If there is no genuine issue of material fact, then the Court does not invade the province of the jury in granting summary judgment because the Court has not resolved issues of disputed fact which are within the province of the jury to decide. *Internat'l Minerals and Min. Corp. v. Citicorp North America, Inc*., 736 F.Supp. 587, 596, n. 8 (D.N.J. 1990). Therefore, it is not sufficient to state, as plaintiffs did, that these facts are controverted. Consequently, the Court should consider these facts to be admitted. *United States v. United States Currency*, No. 06-0862-CV-W-FJG, 2008 WL 4816984 (W.D.Mo. Oct. 31, 2008).[3]

## CONCLUSION

Travelers respectfully urges this Court to enter summary judgment in its favor on plaintiffs' claim under the Crime Policy because plaintiffs have been unable to refute the fact that their loss was caused directly or indirectly by James Fox, an LLC Member and Officer-Shareholder as defined by the Crime Policy, and to the extent that Terry Griffith, a fellow

---

[3] Plaintiffs also claim that paragraphs 83-88 of Travelers' Statement of Uncontroverted Material Facts, which relate to their claim of vexatious refusal to pay, invade the province of the jury, but, confusingly, that they are "*legal conclusion[s]* to be decided by the *trier of the fact*." It has long been recognized, however, that the question whether an insurer vexatiously refused to pay claim is a question of fact. *Columbian Nat'l Life Ins. Co. v.*

employee of plaintiffs, was involved, she was acting in collusion with Fox. Those facts bring the claim squarely within the Officer-Shareholder exclusion and compel the conclusion that the claim is not covered. Likewise, Travelers respectfully urges this Court to enter summary judgment in its favor on plaintiffs' claim for vexatious refusal to pay because there is no coverage for plaintiffs' claim under the Crime Policy. Travelers also requests this Court, if it is not able to enter summary judgment disposing of the entire case, to determine what material facts are not genuinely at issue as provided by Fed.R.Civ.P. 56(d)(1).

s/ Keith Witten
KEITH WITTEN
Missouri Bar no. 23586
Building 14, Suite 630
8717 West 110th Street
Overland Park, KS 66210
(913) 317-5100
Fax (913) 317-9100
kwitten@gh-kc.com

**ATTORNEYS FOR DEFENDANT TRAV-ELERS CASUALTY AND SURETY COM-PANY OF AMERICA**

## CERTIFICATE OF SERVICE

I certify that on this 14th day of April, 2010, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which sent notification of such filing to the following: Leonard Rose, Amy Loth Allen and Kate O'Hara Gasper, Lathrop & Gage, L.C., 2345 Grand Boulevard, Kansas City, MO 64108, attorneys for plaintiffs Tactical Stop-Loss, L.L.C. and TSL Holdings, Inc. and American Trust Administrators, Inc. and I certify that I have mailed by United States Postal Service the documents to the following non CM/ECF participants: none.

s/ Keith Witten
Attorneys for defendant Travelers Casualty and Surety Company of America

*Keyes*, 138 F.2d 382 (8th Cir. 1943). Therefore, plaintiffs' response that Travelers' Statements of Uncontroverted Material Facts 83-88 are legal conclusions is incorrect.

**LIST OF ADDITIONAL EXHIBITS**

S. Excerpts from Sworn Statement of Terry Griffith taken February 23, 2010

T. Excerpts from Deposition of in Case No. 4-08-cv-00962-FJG

U. Excerpts from Deposition of Tara Munderville in Case No. 4-08-cv-00962-FJG

V. S. Arena, D. Burkholder & E. Hurwitz, Exclusions Other Than Inventory Loss, in Annotated Commercial Policy 285 (2d ed. 2006).