# IN THE UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| TACTICAL STOP-LOSS LLC, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) No. 08-0962-CV-W-FJG |
| TRAVELERS CASUALTY AND SURETY | ) |
| COMPANY OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Pending before the Court is Defendant Travelers Casualty and Surety Company of America's Motion for Summary Judgment (Doc. No. 80), which will be considered below. As a preliminary matter, the request for oral argument contained in plaintiffs' opposition (Doc. No. 87) will be **DENIED.**

## I.    Background

Plaintiffs are Tactical Stop-Loss, LLC, TSL Holdings, Inc., and American Trust Administrators.  Plaintiffs purchased an insurance policy from Defendant Travelers that purportedly provides insurance coverage for employee theft and ERISA fidelity theft. Plaintiffs allege that their former president (James E. Fox) took ultra vires and illegal actions by diverting large amounts of money into personal bank accounts other improper accounts. Plaintiffs state that their vice president and chief operating officer (Terry Griffith) was acting in collusion with Fox to illegally divert Tactical & ATA's funds.  Plaintiffs state that they notified defendant of these thefts, which are purportedly covered by their policy with defendant.  Plaintiffs allege that defendant failed to respond to plaintiffs' demand for coverage.  In its answer, defendant argues that the policy does not provide coverage for the loss caused by Mr. Fox because officer-shareholder theft is excluded from coverage. Defendant further argues that any loss caused by Ms. Griffith is excluded from coverage

because she was aiding and abetting Mr. Fox.

## II.    Facts

Plaintiff Tactical Stop-Loss, LLC ("TSL") is a Missouri limited liability company with its principal place of business in Lee's Summit, Missouri.  Plaintiff TSL Holdings, Inc. (TSL Holdings") is a Missouri corporation with its principal place of business in Lee's Summit, Missouri.  Plaintiff American Trust Administrators, Inc. ("ATA") is a Kansas corporation with its principal place of business in Overland Park, Kansas, but authorized to do business in the State of Missouri.  All three plaintiffs have a business address of 255 Northwest Blue Parkway, Lee's Summit, Missouri 64063.  Defendant Travelers is a Connecticut corporation with its principal place of business in the State of Connecticut.  This is a civil action in which the Court has diversity jurisdiction, pursuant to 28 U.S.C. 1332(a).

Plaintiffs seek to recover from Travelers under a crime fidelity bond, Policy No. 104880254, for losses allegedly sustained as a result of unauthorized actions by James E. Fox ("Fox") and Terry Griffith ("Griffith") acting in collusion with him. Complaint (Doc. No. 1), ¶¶ 10-15.[1]

TSL and ATA were Managing General Underwriters for various insurance companies in the marketing, selling, underwriting, and administration of medical stop loss insurance policies submitted by Third Party Administrators and brokers. Stop-loss insurance is excess health care coverage which allows employers to self-insure a retention amount for the first portion of each individual employee's health care coverage and purchase excess health care coverage for the portion above the self-insured retention.

---

[1]Plaintiffs attempt to controvert this paragraph in part.  Plaintiffs state that they seek to recover under the crime fidelity bond for losses sustained as a result of the unauthorized actions by Griffith, not Fox.  However, the language used in plaintiffs' complaint (Doc. No. 1) indicates that Griffith "act[ed] in collusion with Fox to illegally divert [plaintiffs'] funds," (id., ¶ 12), "aid[ed] and abett[ed] Fox in his illegal activities," (id.), "aid[ed] and abet[ted] Fox . . . to make herself valuable to him," (id. ¶ 13), and "aided and abetted Fox in stealing from Tactical and ATA," (id. ¶ 14).

Policy premiums, which include management fees, fronting fees, taxes, and the risk premiums were held in trust in various separate dedicated accounts by TSL and/or ATA. At all relevant times, Fox was President of TSL and ATA, and Griffith was Vice President and Chief Operating Officer of TSL and ATA.

Plaintiffs' Complaint also alleged: "Fox took several unauthorized actions that were not only ultra vires but also illegal, thereby diverting: (1) over $900,000 into his personal bank account; and (2) over $1.5 million from the various separate dedicated accounts into Tactical Stop-Loss's Operating Account to fund operations." Complaint (Doc. No. 1), ¶ 11.

Plaintiffs Complaint further alleged:

> *Griffith was acting in collusion with Fox to illegally divert Tactical Stop-Loss's and ATA's funds.* Specifically, Griffith knew about *Fox's unauthorized transfers* . . . , but she did nothing about it. . . . [S]he neither notified any of the owners of Tactical Stop-Loss or ATA of the unlawful activity, nor did she take any action herself to stop it, *thereby aiding and abetting Fox in his illegal activities.*

Complaint (Doc. No. 1), ¶ 12 [emphasis added].

Plaintiffs Complaint further alleged:

> *Griffith . . . , in order to aid and abet Fox and to make herself valuable to him, misled the auditors as to the financial condition of the company.* Griffith misrepresented to the auditors that (1) a $1.4 million liability had been paid down to $250,000 and that the companies were continuing to pay it down; (2) that there were no "true-ups" with the insurance trust accounts at the end of every year when in fact there were; and (3) that there were no audit reports on Tactical or ATA when in fact there were.

Complaint (Doc. No. 1), ¶ 13 [emphasis added]. Fox was terminated as President of TSL and ATA on or about November 30, 2007.

### The Policy

Travelers issued Crime Policy No. 104880254 ("Crime Policy") covering loss discovered by the Insured during the Bond Period, January 25, 2007, to January 25, 2008. The Crime Policy provides: "[Travelers] will pay you for direct loss that you sustain which

is directly caused by a **Single Loss** taking place at any time and which is **Discovered** by you during the **Policy Period** . . . ." Complaint (Doc. No. 1), para. 7 and Ex. A to Complaint (Doc. No. 1-1), p. 43.[2]

The Single Loss Limit of Liability for Employee Theft in the Crime Policy is $1,000,000.00 with a Single Loss Retention of $10,000.00.

The Crime Policy contains the following coverage provisions:

I. INSURING AGREEMENTS

This **Crime Policy** shall provide coverage under each of the following Insuring Agreements. . . .

A. FIDELITY

    1.    Employee Theft

        We will pay you for your direct loss of, or your direct loss from damage to, **Money, Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

Complaint (Doc. No. 1), ¶ 7 and Ex. A to Complaint (Doc. No. 1-1), p. 43.

The Crime Policy also contains the following exclusions:

IV. EXCLUSIONS

This **Crime Policy** does not cover: . . .

C. loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by you, your natural person partners, any **LLC Member** or **Officer-Shareholder**, whether acting alone or in collusion with others; . . .

---

[2]Plaintiffs indicate that the quoted language in this and the next several paragraphs is part of a Travelers form policy drafted by Travelers that—other than the limit of insurance and deductible——was not negotiated or modified in any way by Plaintiffs or their broker. (Affidavit of Joseph D. Timmons ("Timmons Aff.), ¶ 2, attached to Doc. No. 87 as Exhibit 1.)

D. loss resulting directly or indirectly from any other fraudulent, dishonest or criminal act by any **Employee** or **Fiduciary** whether acting alone or in collusion with others, unless covered under Insuring Agreements A.1., A.2., A.3., F.2., or H.;

Complaint (Doc. No. 1), ¶ 7 and Ex. A to Complaint (Doc. No. 1-1), p. 54. (Hereafter, the Court will refer to Exclusion IV.C. as the "Officer-Shareholder exclusion".)

The Crime Policy defines the term "Single Loss":

RR. "**Single Loss**" means:

　　1.　　for purposes of Insuring Agreement A.:

　　　　a.　　an individual act;

　　　　b.　　the combined total of all separate acts; or

　　　　c.　　a series of related acts;

committed by an **Employee** or committed by more than one **Employee** acting alone or in collusion with other persons both during and before the Policy Period; . . . .

Complaint (Doc. No. 1), ¶ 7 and Ex. A to Complaint (Doc. No. 1-1), Doc. No. 1-1, p. 53.

The Crime Policy also defines the terms "LLC Member" and "Officer-Shareholder":

EE. "**LLC Member**" means any natural person who has an ownership interest in a limited liability company.

JJ. "**Officer-Shareholder**" means any officer who has a twenty-five percent (25%) or greater ownership interest in any one or more Insureds.

Complaint (Doc. No. 1), ¶ 7 and Ex. A to Complaint (Doc. No. 1-1), pp. 51-52.

The Crime Policy further provides:

**II. GENERAL AGREEMENTS**

A. JOINT INSURED . . .

　　3.　　An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

Complaint (Doc. No. 1), ¶ 7 and Ex. A to Complaint (Doc. No. 1-1), p. 46.

***The Proof of Loss***

Plaintiffs submitted a Proof of Loss signed by Joseph Timmons, President and CEO of TSL dated April 22, 2008, stating that the "loss is due to Dishonesty of the Insured's employee(s) whose name(s) and positions are: James E. Fox – Former President and CEO [and] Terry M. Griffith - Former Vice President and Chief Operating Officer." The Proof of Loss also states that the loss is due to "Griffith acting alone or in collusion with Fox to misappropriate company funds; Fox taking and misappropriating company funds and funds belonging to clients." (Doc. 81 at Ex. B., p.1). Timmons signed the Proof of Loss under oath after reading it and indicated at his deposition that it is still a correct statement of plaintiffs' claim, although there is more detail to the claim than what is shown in the Proof of Loss.

Referenced in the Proof of Loss was a March 27, 2008, letter from Amy Loth Allen to Travelers which provided further details of the loss and stated:

> TSL [defined on p. 1 of the letter as Tactical Stop-Loss, LLC] and ATA [defined on p. 1 of the letter as American Trust Administrators, Inc.] are not making a claim under Insuring Agreement A.1 (Fidelity Employee Theft) of the Policy for Fox's actions as we realize that said loss is excluded under Section IV.C. However, TSL and ATA are making a claim under Insuring Agreement A.2 (ERISA Fidelity) for the losses suffered by any covered Claim Employee Benefits Plan as a result of Fox's actions.
>
> More importantly, however, is that we have just recently discovered that Griffith has been acting in collusion with Fox to illegally divert TSL's and ATA's funds as set forth above. As such, we are also notifying you of claims covered under Section I.A.1 and 2 with regard to Griffith's actions. . . .
>
> Specifically, we recently discovered that Griffith knew about Fox's unauthorized transfers (her job as COO included "reconciling" bank accounts), but that she did nothing about it. Even though Griffith was a Fiduciary, she neither notified any of the owners of TSL or ATA of the unlawful activity, nor did she take any action herself to stop it. In addition, when TSL and ATA were audited in 2007 to reconcile 2006 year end papers, Griffith affirmatively misled the auditors as to the financial condition of the

6

company. Griffith misrepresented to the auditors that (1) a $1.4 million liability had been paid down to $250,000 and that the companies were continuing to pay it down; (2) that there were no "true-ups" with the insurance trust accounts at the end of every year when in fact there were; and (3) that there were no audit reports on TSL and ATA when in fact there were.

In sum, evidence that we have now discovered demonstrates that Griffith not only aided and abetted Fox in stealing from TSL and ATA (as well as the trust accounts) but that her conduct was intentional and unlawful, both by her silence and her affirmative acts.

Doc. No. 81, Ex. C, p. 2.

The Proof of Loss alleged that plaintiffs sustained two categories of loss as a result of the dishonest and fraudulent acts of Fox and Griffith: "(1) Unauthorized transfers from Tactical Stop-Loss/American Trust Administrators' Operating Account (and a trust account) directly to Fox's personal account" in the amount of $930,104.31, and (2) "Unauthorized transfers from Tactical Stop-Loss/American Trust Administrators' trust accounts to Tactical Stop-Loss' Operating Account (amount out-of-trust; this amount includes the amounts that went directly to Fox's personal account)" in the amount of $1,861,047.83, for a total claimed loss of $2,791,152.14. Doc. No. 81, Ex. B, p. 2. Plaintiffs' only claim against Travelers is for these two categories of loss. Plaintiffs note that although $930,104.31 of the embezzled funds went to Fox's personal banking account, $1,861.047.83 of the embezzled funds stayed in Tactical Stop-Loss's Operating Account to bankroll Plaintiffs' operations. See Doc. No. 45, pp. 1-2.

### *Nature and Scope of Plaintiffs' Claim*

Plaintiffs claim against Travelers is solely based on the Crime Policy, Ex. A (Doc. No. 1-1) to Complaint. As of the date of plaintiffs' 30(b)(6) deposition, plaintiffs claimed coverage in this case only under the Employee Theft provision of the Crime Policy and no other. Plaintiffs are not making a claim under the Employee Theft of Client Property or ERISA Fidelity coverages of the Crime Policy.

Plaintiffs admit that there is no coverage under the Crime Policy for loss resulting directly or indirectly from any fraudulent or dishonest act committed by Fox because he was an Officer-Shareholder as defined in the Crime Policy. See Doc. No. 81, Ex. A, p. 22, line 14-p. 23, line 16; p. 74, line 9-p. 75, line 2; Ex. C, p. 2.  However, plaintiffs further argue that the Crime Policy provides coverage for Griffith's unlawful actions because the Crime Policy expressly covers "Theft or Forgery committed by an Employee . . . acting alone or in collusion with other persons."  Doc. No. 81, Ex. C.

***Plaintiffs' Claims Regarding Conduct of Fox***

At all relevant times, Fox had a 40% ownership interest in TSL, and TSL Holdings and Joseph Timmons and Kevin Westrope each had a 30% ownership interest in those companies.  TSL Holdings, Inc. holds 100% of the stock of ATA, and Fox's, Timmons's and Westrope's respective ownership interest in ATA at all relevant times was indirect through TSL Holdings.  Plaintiffs also admit that Fox was a member of TSL.

TSL and TSL Holdings filed a Petition against Fox in the Circuit Court of Jackson County, Missouri in Case No. 0716-CV37221 on December 18, 2007. Doc. No. 81, Ex. F. In Case No. 0716-CV37221, plaintiffs TSL and TSL Holdings Petition alleged:

> 20. Plaintiffs have recently discovered that during his employment with Plaintiffs, Fox used Plaintiffs' property to embezzle substantial sums of money from Plaintiffs by diverting and transferring money from Plaintiffs' bank accounts to his Personal Account. . . .
>
> 22. More specifically, Fox set up a system that transferred funds from TSL's Operating Account to his Personal Account when his Personal Account hit a predetermined minimum balance.
>
> 23. Fox, without the knowledge or consent of Plaintiffs, surreptitiously transferred Plaintiffs' funds in the following ways:
>
> > (a) Fox made transfers between Trust Accounts (movement of premiums/transfers from the Premium Accounts to Claims Accounts or Escrow Accounts, etc.);
> >
> > (b) Fox made transfers from Trust Accounts to TSL's Operating

8

> Account (for earned or unearned revenue);
>
> (c) Fox made transfers directly from TSL's Operating Account to his Personal Account;
>
> (d) Fox made transfers directly from Trust Accounts to his Personal Account;
> . . . .

Doc. No. 81, Ex. F.

Fox committed suicide on April 18, 2008. Plaintiffs TSL and TSL Holdings filed Claims in the Estate of James E. Fox, Deceased, Estate No. 09P8-PR00340 in the Probate Division of the Circuit Court of Jackson County, Missouri on April 17, 2009. Doc. No. 81, Exs. J and K. Plaintiffs TSL and TSL Holdings alleged in their Claims in the Estate of James E. Fox, Deceased:

> [C]laimant is Tactical Stop-Loss, L.L.C.[and TSL Holdings, Inc.], . . . and . . . there is due claimant from this estate sums to be determined as a result of embezzlement and other tortious acts by the decedent as more fully set forth in the Attachment to Claim of Tactical Stop Loss, LLC & TSL Holdings, Inc. and the Petition attached hereto and filed in the Circuit Court of Jackson County, Missouri at Kansas City, in the case of Tactical Stop-Loss, LLC, TSL Holdings, Inc. vs. James E. Fox, Case No. 0716-CV37221. . . .

Doc. No. 81, Exs. J and K.

Plaintiffs TSL and TSL Holdings alleged in Attachment to Claim in the Estate of James E. Fox, Deceased:

> ATTACHMENT TO CLAIM OF TACTICAL STOP LOSS, LLC & TSL HOLDINGS, INC.
>
> Claimants, Tactical Stop-Loss, LLC . . . and TSL Holdings, Inc. . . . state . . . In the course of doing business with these employers, TSL maintained a total of thirty-four (34) active bank accounts for their clients, all accounts held at Union Bank. . . .
>
> Prior to Decedent's death, TSL had filed suit against Decedent (Case No. 0716-CV-37221) because TSL believes that during his employment, Decedent used TSL's property to embezzle substantial sums of money by diverting and transferring money from TSL's Union Bank accounts to the

Union Bank account held in the name of either decedent and/or Joyce L. Fox, or both . . .

In addition, Decedent unlawfully diverted money from some or all of said 34 bank accounts into the accounts of TSL and/or TSL Holdings for general corporate purposes thereby creating liability to the equitable owners of said accounts. The total amount of unauthorized transfers and diversions that Decedent made from TSL's accounts and said 34 Union Bank accounts is approximately $2,000,000. . .

Doc. No. 81, Exs. J and K. Plaintiffs admit that Fox was personally involved in every one of the transfers of funds that went into his personal bank account. See Doc. No. 81, Ex. A, p. 99, line 25-p. 100, line 5.

Fox advised Timmons that he had taken some money that he shouldn't have in October 2007; however, he advised that the amount was "quite inconsequential," and that he was "willing to reimburse the corporation for it." Doc. No. 81, Ex. A, p. 79, line 12-p. 80, line 1. Fox's employment was terminated on November 30, 2007, because plaintiffs had enough information at that point in time to substantiate the facts that he was stealing money personally and utilizing it for his own personal benefit.

### Plaintiffs' Claims Regarding Conduct of Griffith

Plaintiffs claim Griffith acted in collusion with Fox to illegally divert TSL and ATA funds because she knew about Fox's unauthorized transfers but did nothing about it and although she was a fiduciary she didn't notify any of the owners of TSL or ATA of the unlawful activity or take any action to stop it.[3] Plaintiffs further claim that Griffith affirmatively misled the auditors as to the financial condition of the company by misrepresenting to them that (1) a $1.4 million liability had been paid down to $250,000 and that the companies were continuing to pay it down; (2) that there were no "true-ups" with

---

[3]Plaintiffs indicate that this, and the next several paragraphs are "incomplete," as Griffith herself committed several independent acts and omissions causing plaintiffs' loss. Defendant, however, indicates that the allegedly independent acts of Griffith are all actually acts committed as part of her active participation in the embezzlement conspiracy with Fox.

the insurance trust accounts at the end of every year when in fact there were, and (3) that there were no audit reports on TSL, or ATA when in fact there were. Plaintiffs further claim that Griffith not only aided and abetted Fox in stealing from TSL and ATA (as well as the trust accounts) but that her conduct was intentional and unlawful, both by her silence and her affirmative acts.

Plaintiffs claim that the statement of actions committed by Griffith in the March 27, 2008, letter, referenced above, is not all inclusive and that e-mails that plaintiffs reviewed after she resigned provide additional details of her conduct. Plaintiffs claim that the "main gist" of the additional activities of Griffith not mentioned in the March 27, 2008, letter were:

(a) "she was not able to provide as much information to another employee because of what *Fox* was doing with some of the operating accounts and the trust accounts;"

(b) "The claims people and the accounting people had questions that she could not answer or did not answer *because it would divulge what was going on between her and Fox*;"

(c) "She was paid an inordinate amount, much greater than what perhaps we [plaintiffs] would anticipate paying someone in her position with her educational background;"

(d) "She was being paid bonuses by Fox on a monthly basis that started in, I believe late January of 2007[4];"

---

[4]Plaintiffs note that Griffith testified she earned various and intermittent bonuses, which she only received when the operating account had sufficient funds. Griffith Depo, Ex. 5 to Doc. No. 87, 47:15-56:22. Griffith indicated these bonuses were based on sales performances from plaintiffs' sales team, but Griffith's duties did not involve any sales. She indicated that she only received these bonuses when "there was enough cash flow," but that her bonuses amounted to approximately $40,000 a year. Id. at 56:12-22. Payment was only made when the operating account had sufficient funds to pay her bonuses. Id. However, Griffith negotiated the compensation package with Fox, and Fox dictated and decided when and how much to pay Griffith in bonuses. Ex. T to Doc. No. 99, 26:12-28:17; 30:24-31:19, 51:3-52:10; 55:14;56:13. Defendant indicates that payment of the bonuses, therefore, does not amount to an independent act of theft on the part of Griffith. Further, defendant notes that plaintiffs' claimed losses are not the amounts of bonuses paid to Griffith, but rather the transfers to Fox's personal accounts and into the Tactical Stop-Loss operating account. See Doc. No. 81-2, p. 2.

(e) "Her son and daughter-in-law, even her ex-husband, was employed for awhile by Tactical [Stop-Loss] as a result of, I don't know, I guess her holding it over Jim [Fox]'s head as far as the fact that Jim [Fox] was doing these things and she was aware of it[5];" and

(f) "She withheld information to the insurance companies that were in - - because of our handling of the funds of insureds and for the - - and the insurance premiums due to the insurance carriers. They periodically came in and audited our claims funds as well as our trust accounts for the premiums that were being held in trust, and whenever there were discrepancies, she was assisting in hiding those to those audit companies. She was hiding it from the insurers, *so she was actively participating in this stealing, if you wish, of funds.*"

Doc. No. 81, Ex. A, p. 36, line 1-p. 38, line 20 [emphasis added].

Plaintiffs claim that what was going on between Griffith and Fox is that Griffith was aware of what was being done by Fox and accounted to him to a certain degree, she ran two sets of spreadsheets to keep track of what should have been going on and what was actually going on, and she participated in some of the transfers of funds from trust accounts to the operating account. Plaintiffs admit that Griffith was a necessary participant in Fox's unauthorized transfers out because she knew of them since she was doing monthly bank reconciliations and instead of reporting it, she chose to hide it.

Griffith did not receive the $930,104.31 that went into Fox's personal banking account; however, plaintiffs indicate that the improper benefits Griffith allegedly received are included in the second category of loss on p.2 of the Proof of Loss. Plaintiffs' 30(b)(6) representative testified that the transfer of funds from the trust accounts into the operating

---

[5]Plaintiffs note that Griffith testified that her son, daughter-in-law, and then-husband all worked for Plaintiffs, and all of them were paid through Tactical's operating account. Griffith Depo, Ex. 5 to Doc. No. 87, 33:16-18; 41:20-42:8; 58:12-21. However, Griffith also testified that while her son worked for Tactical Stop-Loss, and her opinion was gathered as to his employment, Fox made the final decision to hire him, just as he did with all employees. Ex. T to Doc. No. 99, 33:16-18; 35:5-37:6. Additionally, defendant notes that plaintiffs' claimed losses are not the amounts of compensation paid to Griffith's relatives, but rather the transfers to Fox's personal accounts and into the Tactical Stop-Loss operating account. See Doc. No. 81-2, p. 2.

account would not have caused a loss if they had been immediately transferred back into the trust accounts so long as plaintiffs kept the funds that were supposed to be on hand. Doc. No. 81-1, p. 57, line 18-p. 58, line 4.  All of the transfers into Fox's personal bank account came from the TSL operating account except for one from the National Managed Care Trust account.

Plaintiffs claim that the specific acts of theft Griffith committed consisted of (1) doing some of the transfers from trust accounts into the operating account or from trust accounts into claims accounts or claims accounts into the trust account or the operating account, (2) assisting from the stand point of covering the shortfall in the various different accounts on audits that were being conducted by insurance auditors by e-mail or verbally with bank statements that were not produced by the bank but appeared to be produced by her as opposed to being produced by the bank, (3) active involvement in covering things up to employees inside the company, and (4) in general, actively participating in doing illegal activities.[6]  Plaintiffs admit that the doctoring of bank statements done by Griffith helped to conceal the things that Fox was doing.

Plaintiffs responded to Defendant Travelers' First Interrogatory No. 14, requesting plaintiffs to state all facts upon which relied to support the allegations of paragraph 13 of the Complaint, as follows:

> ANSWER: . . . Terry Griffith advised James Fox to block the co-owners' efforts to hire an independent accountant to review the books. . . . Ms. Griffith recorded all general ledger and cash transactions, but knowingly kept

---

[6]Plaintiffs complain that this paragraph of Travelers' Statement of Uncontroverted Material Facts is incomplete, citing in addition the deposition testimony of Joseph D. Timmons, their 30(b)(6) representative, from p. 87, line 15 to p. 90, line 8. However, as noted by defendant, the additional testimony actually does not concern additional specific acts of theft Griffith allegedly committed but instead the purpose of her acts (Doc. No. 87-2, p. 87, lines 15-p. 88, 12); and whether the payments Ms. Griffith made to herself were part of the unauthorized transfers from the trust accounts to the operating account (Doc. No. 87-2, p. 88, line 13-p. 90, line 8).

inaccurate and fraudulent records as though no money had been embezzled. Mr. [sic] Griffith provided such fraudulent records to Timmons and Westrope. Ms. Griffith also assisted in preparing fraudulent interim financial statements that were provided to Timmons and Westrope in mid-2007. Ms. Griffith also provided fraudulent records of cash transactions to auditors for Gerber and Companion, while they were in the process of auditing underwriting, claims management, and cash transactions of their business with Tactical Stop-Loss. Further, Griffith inaccurately represented important financial information to Plaintiffs' auditors Stan House and Kathy Wipf in September 2007. Ms. Griffith indicated that a $1.4 million liability had been paid down to $250,000 and that the companies (Tactical Stop-Loss) were continuing to pay it down. Ms. Griffith incorrectly represented that there were no "true-ups" with the insurance trust accounts at the end of every year, when in fact there were. Ms. Griffith incorrectly stated that there were no audits on Tactical Stop-Loss, LLC or American Trust Administrators, Inc., when in fact there were. *Ms. Griffith . . . knowingly misrepresented these facts in an effort to aid Mr. Fox* [emphasis added].

Doc. No. 81, Ex. L.

TSL and ATA filed a Petition against Griffith in the Circuit Court of Jackson County,

Missouri on April 4, 2008, in Case No. 0816-CV10400, alleging:

12. From 2005 through late 2007, James E. Fox ("Fox"), the former President of TSL and ATA, had been misappropriating funds from those companies. Specifically, Fox set up a system that transferred funds from TSL's Operating Account to his personal banking account when said personal banking account hit a predetermined minimum balance. Unauthorized transfers were also made between trust accounts and from trust accounts to TSL's Operating Account *to fund TSL's operating losses*.

13. Millions of dollars were unlawfully transferred, and of that, over $900,000 was unlawfully transferred directly to personal bank accounts.

14. *Griffith was acting in collusion with Fox and otherwise aided and abetted him in misappropriating finds from TSL and ATA.*

15. Griffith was aware of the unlawful transfers dating back to early 2006, if not before.

\*\*\*

19. Griffith, as a fiduciary, neither advised the owners of TSL or ATA of this unlawful conduct nor did she take any action to stop it. *Rather, she fostered the continued unlawful transfers.*

20. In addition to her silence, Griffith affirmatively defrauded agents of TSL and ATA. Specifically, when TSL and ATA were audited in 2007 regarding the companies' 2006 year-end papers, Griffith misrepresented to the auditors the financial condition of TSL and ATA. Griffith intentionally misrepresented to the auditors that Griffith misrepresented to the auditors that (1) a $1.4 million liability had been paid down to $250,000 and that the companies were continuing to pay it down; (2) that there were no "true-ups" with the insurance trust accounts at the end of every year when in fact there were; and (3) that there were no audit reports on Tactical or ATA when in fact there were.

21. Griffith's intent in making these material misrepresentations was to mislead the auditors and further conceal the unlawful transfers *of* [sic] *which she knew of and was a part of as set forth herein* [emphasis added].

Doc. No. 81, Ex. M. The First and Second Amended Petitions in Case No. 0816-CV10400 filed on May 20, 2008, and November 16, 2009, made the same allegations. Doc. No. 81, Exs. N and O.

### Deposition of Griffith in Case No. 0816-CV10400

Amy Loth Allen, counsel for plaintiffs in this case as well as in Case No. 0816-CV10400, deposed Griffith in Case No. 0816-CV10400 on November 18, 2009 and Griffith testified that Fox hired her to be an administrative manager for TSL on April 15, 1999. Fox appointed Griffith vice president and chief operating officer of TSL in 2005. After reviewing a bank statement one month Griffith became aware of an arrangement with Union Bank wherein Union Bank would transfer money to Fox's personal checking account when it dropped to a predetermined amount. Griffith asked Fox about the transfers and he told her they were overdraft protection for his personal account. Fox would tell Griffith when he moved money from trust accounts through online banking; Griffin was not authorized to move money between trust accounts.[7] Griffith would tell Fox when an account was short

---

[7]Plaintiffs indicate that Griffith transferred money between trust accounts, based on her subsequent sworn statement, attached as Ex. 3 to Doc. No. 87. However, the Court agrees with defendant that plaintiffs read too much into Griffith's testimony. Griffith testified that she did not have authority to move money between trust accounts. In her sworn statement (Ex. 3 to Doc. No. 87), she testified that while she did not recall having done so, it is possible that she may have moved money from one carrier's

and Fox would then make transfers from trust accounts into the TSL operating account. Griffith had to rely on Fox telling her when he moved money to post it. Fox never asked Griffith to make any internet transfers from a TSL account into Fox's personal bank account nor did she ever do so.

## III. Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. Id. Rather, "the disputes must be outcome determinative under prevailing law." Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586. Demanding more

_____

account to another once or twice. Defendant further argues that whether Griffith moved funds on a few occasions hardly matters, given plaintiffs' admission that Griffith acted in collusion with Fox, thereby triggering the Officer-Shareholder exclusion.

than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.

## IV.    Analysis

Defendant argues that summary judgment on plaintiffs' coverage claim is proper because (1) the Officer-Shareholder exclusion applies to all of the claims; and (2) the second category of loss claimed by plaintiff (the amounts transferred to plaintiffs' operating account out of the trust accounts) does not constitute a loss under the policy. Defendant further argues that summary judgment is appropriate on plaintiffs' claim for vexatious refusal to pay, as (1) there can be no claim for vexatious refusal when the underlying claim is not valid; and (2) if the defendant has reasonable cause to believe it has a meritorious defense, there can be no award of damages for vexatious refusal to pay. These grounds will be considered below.[8]

### A.  Coverage Issues

#### 1.    Legal Standard

Under Missouri law, the language used in an insurance policy is to be given its plain meaning. Robin v. Blue Cross Hosp. Serv., Inc., 637 S.W.2d 695, 698 (Mo. 1982). The plain meaning of the words and phrases used in an insurance policy is determined with reference to the context of the policy as a whole rather than in isolation. Watters v. Travel Guard Intern., 136 S.W.3d 100, 108 (Mo. Ct. App. 2004). Thus, in determining the meaning of the words and phrases of an insurance policy, "the court will not isolate ambiguous phrases, but will read the policy as a whole giving every clause some meaning if it is reasonably able to do so." Mazzocchio v. Pohlman, 861 S.W.2d 208, 210-11 (Mo. Ct. App.

---

[8]The parties agree that Missouri law applies in this matter.

1993). When an insurance policy is unambiguous, "the rules of construction are inapplicable, and absent a public policy to the contrary, the policy will be enforced as written." Krombach v. Mayflower Ins. Co., Ltd., 827 S.W.2d 208, 210 (Mo. 1992).

On the other hand, if the language is ambiguous, the court adopts the "interpretation that is most favorable to the insured." Penn-Star Ins. Co. v. Griffey, 306 S.W.3d 591, 596 (Mo. Ct. App. 2010) (citing Capitol Indem. Corp. v. Callis, 963 S.W.2d 247, 249 (Mo. Ct. App. 1997)). "An ambiguity arises when there is duplicity, indistinctness, or un certainty in the meaning of words used in the contract. Language is ambiguous if it is reasonably open to different constructions and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy." Krombach, 827 S.W.2d at 210 (internal citations omitted). However, the Court will not create an ambiguity or rewrite an unambiguous policy to enforce a preferred construction. Mazzocchio, 861 S.W.2d at 211.

### 2.    Officer-Shareholder Exclusion

As noted in the statement of facts, the Crime Policy does not cover "loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by you, your natural person partners, any **LLC Member** or **Officer- Shareholder**, *whether acting alone or in collusion with others* . . . ." [emphasis added]. Thus, defendant notes that losses attributable to the acts of Fox, as an LLC Member and  Officer-Shareholder, are not covered by the Crime Policy. Defendant further notes that Fox was acting in collusion with Griffith as to all the losses alleged by plaintiffs in this matter.  Defendant argues that, because it cannot be disputed that Fox was an Officer-Shareholder who acted alone or in collusion with Griffith to commit the fraudulent, dishonest and/or criminal acts, none of the loss resulting from his conduct is covered by the Crime Policy. Further, defendant argues that because plaintiffs can point to no conduct on the part of Griffith that was not directly or indirectly related to the conduct of Fox, plaintiffs cannot recover for any of Griffith's

alleged conduct.

Defendant cites to cases involving similar instances where an Officer-Shareholder acted in collusion with another employee, and Officer-Shareholder exclusions in crime policies apply to exclude coverage for such losses. See Maryland Cas. Co. v. Clements, 15 Ariz. App. 216, 224, 487 P.2d 437, 445 (Ariz. Ct. App. 1971); In re Payroll Exp. Corp., 216 B.R. 344, 364 (S.D.N.Y. 1997) (concluding that only if the other employees "independently caused losses to PEC through dishonest conduct," would those losses be covered). Defendant suggest that all the losses in this cases were caused directly or indirectly by Fox, and that plaintiff cannot show that Griffith independently caused losses that were not directly or indirectly related to any conduct on the part of Fox. Indeed, as noted by defendant, plaintiffs' complaint, the March 27, 2008 letter from Amy Loth Allen to Travelers, the Proof of Loss, and their petitions/attachments filed in Missouri state court all indicate that (1) Fox caused the loss through the unlawful transfers; and (2) Griffith was acting in collusion with (or aiding and abetting) Fox.

In response, plaintiffs argue (1) the terms "others" and "other persons" in the policy must mean non-employees only (even though those terms are not defined in the Crime Policy), because all employees are covered by the Policy and there is therefore no need to reference any "others" or "other persons" in the policy; (2) the policy covers Griffith, as an employee, for her actions taken either "alone or in collusion with other persons," and Fox can "undoubtedly" be described as "other persons"; (3) defendant somehow uses the term "in collusion with others" out of context, as its only purported purpose is to aggregate losses attributable to several conspirators into a single loss; (4) the exclusion is ambiguous, because, depending on the interpretation, the phrase "in collusion with others" can either provide coverage or bar coverage, and that the Court should accept the interpretation that favors plaintiffs; and (5) a genuine issue of material fact exists as to Griffith's actions, as she is the "but for" cause of plaintiffs' losses, and Griffith acted independently of Fox to fund

her illegitimate bonuses and her family's salaries, which plaintiffs assert smacks of hush money to keep Griffith from blowing the whistle on Fox.

The Court finds that plaintiffs have failed to demonstrate that a genuine issue of material fact remains for trial. As an initial matter, the Court agrees with defendant that plaintiffs' policy interpretation is strained, at best. A straightforward reading of the Crime Policy indicates that it covers losses caused by theft committed by an employee, but excludes losses caused by theft committed by an "LLC Member or Officer-Shareholder, whether acting alone or in collusion with others." The Court will not define the term "others" to mean "non-employees," because, as noted by defendant in its reply, the policy only covers theft committed by <u>employees</u>, and therefore, there would be no need to exclude from coverage thefts committed by non-employees, as those would not be covered anyway. Further, the Court agrees with defendants that the Officer-Shareholder exclusion's use of the terminology "in collusion with others" obviously does not relate to the aggregation of the acts of several conspirators into one loss; instead, as noted by defendant, the purpose is to prevent a wrongdoer (i.e., the policy holder or its member/owner) from profiting from his wrongdoing. Furthermore, the Court finds that the Officer-Shareholder exclusion is non-ambiguous, and the Court will not create an ambiguity here so as to enforce plaintiffs' preferred construction.

Additionally, plaintiffs' assertions that Griffith conducted independent acts are belied by the allegations and evidence in this case. Instead, as noted by defendant, the acts alleged to have been committed by Griffith were all part of her active participation "in an embezzlement conspiracy with then-President James E. Fox," as plaintiffs stated in their suggestions in opposition to the pending motion for summary judgment (Doc. No. 87, p. 1). The Court further agrees with defendant that the test as to whether the Officer-Shareholder exclusion applies is not whether the actions of the "other" colluding with the Officer-Shareholder are the "but-for" cause of the losses; instead, all losses attributable to the

Officer-Shareholder and the "other" colluding with him are excluded. Additionally, the salaries and bonuses paid to Griffith and her family members are not "independent" of Fox; instead, plaintiffs characterize these as "hush money" so that Griffith did not report Fox's thefts. All are part of the same loss.[9]

Therefore, for all the foregoing reasons, plaintiffs' claimed losses are subject to the Officer-Shareholder exclusion in the Crime Policy. Defendants' motion for summary judgment (Doc. No. 80) will be **GRANTED** as to this issue.

### 3. Lack of Loss in Transfers from Trust Accounts into the Operating Account

In the alternative, defendant indicates that there is no compensable loss for the transfers made from the trust accounts into the operating account. Plaintiffs' representative, Timmons, admitted at his deposition that these transfers would not have caused a loss if they had been immediately transferred back into the trust accounts so long as plaintiffs kept the funds that were supposed to be on hand. Ex. A to Doc. No. 81, p. 57, line 18-p. 58, line 4. Furthermore, plaintiffs admit that Fox unlawfully diverted money from some or all of their 34 bank accounts into the accounts of TSL and/or TSL Holdings for general corporate purposes thereby creating liability to the equitable owners of those accounts. See Attachment to Claim in the Estate of James E. Fox, Deceased, Doc. No. 81, Exs. J and K. Defendant indicates that a "bookkeeping or theoretical loss" is not sufficient in order for a fidelity bond to provide coverage. Cincinnati Ins. Co. v. Star Financial Bank, 35 F.3d 1186, 1191 (7th Cir. 1994). Instead, there must be a direct loss or the actual depletion of the insured's funds caused by the employee's dishonest acts. Federal Deposit Ins. Corp. v. United Pacific Ins. Co., 20 F.3d 1070, 1080 (10th Cir. 1994).

---

[9]Plaintiffs certainly have not attempted to segregate the losses attributable to salaries and bonuses paid to Griffith and her family members; instead, plaintiffs attempt to recoup losses of nearly $3 million, much of which was diverted into Fox's personal bank account.

In response, plaintiffs indicate that the funds that remained in the Tactical Operating Account ($1,861,047.83) were used to fund both legitimate and illegitimate expenses, such as Griffith's bonuses. Plaintiffs indicate that once the scheme was uncovered, plaintiffs were forced to enter into repayment agreements with each of the insurance carriers in order to avoid litigation with those carriers. Plaintiffs indicate that, rather than allow plaintiffs to default on their liabilities and enter into bankruptcy, Westrope and Timmons contributed considerable amounts of their personal funds. Plaintiffs indicate that this created a new liability to plaintiffs, rather than shifting a liability on a balance sheet.

In reply, defendant indicates that (1) the repayment agreements and contributions by Timmons and Westrope are not listed by plaintiffs in their exhibit list nor in their Proof of Loss and discovery responses, and instead, the claimed loss has never been anything but the transfers listed in their Proof of Loss, which makes no mention of repayment agreements or amounts contributed. Doc. No. 81-1, p. 19, line 19-p. 20, line 8; (2) the Crime Policy only applies to losses of the insured, not to the losses of Westrope, Timmons, or other third parties; and (3) any liability to the third-party carriers is not a new liability, as plaintiffs were liable for the same amounts when they received the premiums and after the unauthorized transfers.

The Court finds defendant's argument to be persuasive, and defendant's motion will be **GRANTED** on this alternative basis as well.

### B. Vexatious Refusal to Pay

As noted by defendant, under Missouri law there can be no vexatious refusal to pay where a claim is not covered. Calvert v. Safeco Ins. Co. of America, 660 S.W.2d 265, 269 (Mo.Ct.App. 1983). As discussed above, the losses at issue in this lawsuit are excluded under the Officer-Shareholder Exclusion to the Crime Policy. Therefore, there cannot be an award of statutory damages for vexatious refusal to pay. Further, defendant notes that where an insurer has a reasonable cause to believe it has a meritorious defense, there may

be no award of damages for vexatious refusal to pay.  Thornburgh Insulation, Inc. v. J.W. Terrill, Inc., 236 S.W.3d 651, 657 (Mo.Ct.App. 2007).    Certainly defendant has demonstrated it had reasonable cause to believe it had a meritorious defense in this matter. Therefore,  Defendant is entitled to summary judgment on this basis, as well.

**V.    Conclusion**

Therefore, for all the foregoing reasons, defendant's motion for summary judgment (Doc. No. 80) is **GRANTED IN FULL**.  All other pending motions in this case are **DENIED AS MOOT.**


         **IT IS SO ORDERED.**
Date:_____07/14/10_____          **S/ FERNANDO J. GAITAN, JR.**
Kansas City, Missouri                Fernando J. Gaitan, Jr.
                                     Chief United States District Judge